BARNSTEAD *v.* ALTON.

By the act of December 16, 1828, upon any division of a town, the settlement of persons then resident elsewhere, but having a legal settlement in the town divided, followed their former dwelling places ; — if those were dissevered and annexed to another town, their settlement was thereby transferred to that other town.

Within the meaning of that act, a town was divided whenever any portion of it was separated from the rest, whether the severed portion were incorporated into a new town or annexed to an old one.

The act of 1841, abolishing all settlements acquired under laws passed prior to December 31, 1795, operated only to abolish those settlements which it was intended to destroy.

Barnstead *v.* Alton.

Where a woman, having a settlement through her father in one town under laws passed since December 31, 1795, in 1823 married a husband who had a settlement through his father in another town, under laws passed prior to December 31, 1795, she acquired her husband's settlement upon their intermarriage, and retained it until lost by the operation of the act of 1841, after which she ceased to have any settlement in this State.

In a suit for the support of a pauper, where the plaintiffs rely on the settlement of a wife, and allege that her husband had no settlement in this State at their intermarriage, and did not afterwards acquire any, they are bound to prove the truth of this negative allegation, as well the want of any settlement at marriage as the subsequent non-acquisition of one; the establishment of the whole allegation being essential to their right of recovery.

Assumpsit, for the support of Almira H. Twombly and her two illegitimate daughters, paupers, alleged to have a settlement in Alton.

The only point in dispute between the parties was as to the settlement of said Almira, which, if she had any, it was admitted was by derivation.

On the trial, February term, 1855, it was admitted that said Almira was the daughter of Lemuel, Jr., and Abigail Twombly; that said Lemuel, Jr., was the son of Lemuel Twombly, who, prior to 1796, gained a settlement in Rochester, and that said Abigail, his wife, was the daughter of Nathaniel Hayes, who at the time of the marriage of his daughter, in about 1820, was resident and had a settlement in Alton, and she was then living there with him. Said Hayes' farm was partly in Alton and partly in Barnstead, the buildings being in Alton. He removed from Alton in about 1823, and afterwards, in 1840, that part of the farm in Alton was disannexed from that town and annexed to Barnstead, by an act of the legislature.

It was also admitted that Lemuel Twombly, jr., had no settlement except, if any, by derivation. The plaintiffs proposed to offer evidence to show that Lemuel Twombly acquired no settlement in any way after 1801. But they did not propose to offer any to show that he did not acquire one prior to 1801, and after January 1, 1796, which the defendants contended they were bound to show in order to maintain this action, on the ground that the pauper Almira had a settlement in Alton, by derivation

from her mother, which was the ground on which the plaintiffs claimed to maintain it.

Whereupon it was agreed by the parties that the questions arising in this case should be transferred to the Superior Court of Judicature for determination. If said court should be of the opinion that the defendants were not liable, on account of the disannexation of the part of the Hayes farm from Alton and the annexation of the same to Barnstead, or of the settlement gained by said Lemuel Twombly in Rochester prior to 1796, as herein before stated, then judgment was to be ordered for the defendants. So, also, if said court should be of the opinion that the plaintiffs were bound to prove that said Lemuel acquired no settlement between January 1, 1796, and 1801, unless the plaintiffs shall elect to have a further trial before the jury on that point. But if said court should overrule all said objections of the defendants, then a further trial was to be had before the jury as to other facts not herein stated.

*H. A. Bellows*, for the plaintiffs.

On the marriage of Abigail Hayes to Lemuel Twombly, jr., she acquired his settlement, if he had one in this State; if not, her own, which was in Alton, remained.

If the husband had any settlement it was derived from his father, Lemuel Twombly, and the burden is on Alton to show that the father had gained a settlement under a law passed since December 31, 1795.

The law provides that a married woman shall have the settlement of her husband, if he *has*, or *shall acquire* any within this State; otherwise her settlement shall continue, and illegitimate children shall have the settlement of their mother at the time of their birth. Comp. Stat., chap. 69, § 1, p. 157.

It is incumbent on the party alleging a settlement of Lemuel Twombly, jr., to prove it.

The mother is shown to have had a settlement in Alton, and it is no more to be presumed that her husband's father gained a settlement since December 31, 1795, than it is that she was

married, or that her husband had gained a settlement of his own in one of the many ways provided by law.

On the contrary, she is shown once to have had a settlement in Alton, and that state of things is presumed to exist until the contrary is shown. 1 Greenl. Evid., § 42 ; *Brown* v. *King*, 5 Met. 173 ; and her marriage is but one step towards such proof.

The affirmative is on the town of Alton, and there is the burden of proof. *Randolph* v. *Easton*, 23 Pick. 242 ; *Kilburn* v. *Bennett*, 3 Met. 199 ; *Oakham* v. *Sutton*, 13 Met. 192. See, also, *Lang* v. *Steinman*, 1 Met. 204 ; *Belknap* v. *Wendell*, 1 Foster 175 ; 2 Denio 609.

Again, the father of Lemuel Twombly, jr., had no settlement in Barnstead, January 1, 1796, and that state of things is presumed still to exist.

Besides, the negative would, in most cases, be exceedingly difficult, and in many impossible to prove, involving, as it would, frequent changes of residence, the necessity of disproving votes for admission to inhabitancy, the holding of office, residence, and the holding of property, taxation and the payment of taxes.

All this proof would be of a negative character, and might be needed from many towns. And before the passage of the law limiting settlements to those acquired since December 31, 1795, such negative testimony would have been, in many cases, out of the question.

There is nothing in the language of the statute that changes the burden of proof. So legitimate children have the settlement of the father or the mother until they gain one of their own, and it might as well be presumed that they had done so as that Lemuel Twombly, senior, had gained one since January, 1796.

2. The settlement of Lemuel Twombly, senior, gained prior to January 1, 1796, can avail nothing by express provision of the statute. Compiled Stat., p. 167, § 3.

The obligation of towns to support paupers is created by statute. *Meredith* v. *Canterbury*, 3 N. H. 80 ; *Otis* v. *Strafford*, 10 N. H. 353. And it is subject to be changed by statute. No vested right to a settlement any where exists. If, however,

expenses have been incurred, and a cause of action has arisen under an existing statute, it cannot be taken away by statute. But that is not this case. As respects the settlement of Lemuel Twombly, Jr., everything before the statute of January, 1796, is to be disregarded.

3. As to the effect of setting off the residence of McNiel. It was done June session, 1840. Laws of June session, 1840, p. 435. One acre and eighteen square rods of Daniel McNiel's farm, and the buildings, were annexed to Barnstead by this act. Twombly, jr., and wife left Alton in 1823, and were not living in Alton at the time of this annexation. This was not a division of towns, and does not come within the eighth mode of gaining a settlement. *Fitchburg* v. *Westminster*, 1 Pick. 144; *Lexington* v. *Burlington*, 19 Pick. 426; *Hallowell* v. *Bowdoinham*, 1 Greenl. 129.

When part of an existing town is set off on part of another existing town, those inhabitants alone who are then living on the part so detached will acquire a settlement in the town to which they are so annexed. An actual dwelling on that part is necessary. *Southbridge* v. *Charlestown*, 15 Mass. 248; *Fitchburg* v. *Westminster*, 1 Pick. 146; *Lexington* v. *Burlington*, 19 Pick. 426; *Groton* v. *Shirley*, 7 Mass. 156; *Great Barrington* v. *Lancaster*, 14 Mass. 253; *Hallowell* v. *Bowdoinham*, 1 Greenleaf 129.

Our law on the subject of changes in towns is substantially like the law of Massachusetts. See N. H. Laws, Edit. of 1829, p. 301, § 7, which continued in force until 1842. See Mass. Rev. Stat., Edit. of 1836, p. 368, § 1, 10th mode.

*S. W. Rollins* and *James Bell*, for the defendants.

FOWLER, J. The case presents three questions for consideration. First, did the separation of the Hayes farm from Alton and its annexation to Barnstead, in 1840, transfer the settlement of Abigail Twombly, if she then had one in Alton through her father, from Alton to Barnstead; secondly, did the act of 1841,

abolishing the settlement of Abigail Twombly acquired upon her marriage, revive the settlement she previously had through her father, so that her descendants are now chargeable upon that settlement; and thirdly, were the plaintiffs bound to prove that Lemuel Twombly acquired no settlement in this State from January, 1796, to 1801, as they had averred in their declaration.

By the 7th section of the act of the 16th of December, 1828, Laws of 1829, 301, in force in 1840, when the Hayes farm was severed from Alton and annexed to Barnstead, " upon division of towns, every person having a settlement in them, but being removed therefrom at the time of such division, and not having a settlement elsewhere, shall have his settlement in that town wherein his former home or dwelling-place shall be upon such division." The natural and obvious construction of this language is, that upon any division of a town by the separation of a portion of its territory from the rest, every person having a settlement in the divided town, but absent therefrom at the time of the division, shall thereafter have his settlement in that town in which his former home or dwelling-place shall fall. Had there been no decisions elsewhere upon the construction of a similar statute, we should not have believed the words were susceptible of any other interpretation. But in *Hallowell* v. *Bowdoinham*, 1 Greenleaf 129; *Fitchburg* v. *Westminster*, 1 Pick. 144, and *Lexington* v. *Burlington*, 19 Pick. 426, cited by the plaintiff's counsel, a different construction was given to the Massachusetts statute of 1793, almost identical in phraseology with that now under consideration; and it was in effect holden in those cases, that a town was not divided, within the meaning of this clause of the statute, unless separated into two or more parts so nearly equal that each was made into a town. We have carefully examined the decisions in those cases, and are satisfied neither with their reasonings or their result.

In *Hallowell* v. *Bowdoinham*, where the question was similar to the one raised in the case before us, the court, after remarking that the language we have quoted from the act of 1828, " seems to have in view such a division of a town as shall pro-

duce *two* or *more* towns, composed of the same territory which formed the *original* town," say, that the question is *virtually* settled by the decision in *Groton* v. *Shirley,* 7 Mass. 156.    On referring to that decision, it appears to have been upon the construction of another clause of the statute, and with reference to an entirely different matter.    In *Groton* v. *Shirley* it was only decided that where a part of one town was annexed to another, a person living on the territory annexed, and having his settlement in the town to which the annexed territory belonged before its annexation, had his settlement transferred to the town to which the territory whereon he resided at the time was annexed, by virtue of the annexation, precisely as he would have had if the territory annexed had been made into a new town.    The whole effect of the decision was, that the inhabitants of territory severed from one town and annexed to another, had their settlements thereby changed.    It by no means followed that persons who had gained a settlement while living on that same territory, but who were then resident elsewhere, did not also have their settlements changed, by virtue of the clause of the statute now under consideration, upon the annexation.

The decision in *Fitchburg* v. *Westminster* seems to rest mainly upon the assumed hardship of having the settlement, as well of the former residents as of the present occupants, transferred with the annexed territory, and upon the respectable character of the court in *Hallowell* v. *Bowdoinham.*    In *Lexington* v. *Burlington* the decision in *Fitchburg* v. *Westminster* is said to be entirely decisive.

In our judgment, the question before us is determined by the clear and definite terms of the statute itself.    The language is simple, unequivocal, unambiguous, and fairly capable of only one interpretation.    A town is divided whenever any portion of its territory is separated from the rest, without regard to the comparative size of the parts into which it is severed.    The statute expressly enacts, that, upon such division, all persons then absent, but having a settlement in the town whose territory has been dissevered, shall afterwards have their settlement in the

town where their former dwelling-place may happen to be. Such is the natural and ordinary import of the words of the statute, and all our reasoning from the circumstances of the subject matter goes to satisfy us that they were intended to be employed in their natural and ordinary sense. The principle apparently intended to be established by the Legislature was simply this : That whenever an old town, in which absent persons, who had or might become paupers, had their settlement, was in any way broken up, the settlement of those persons should follow their former homes. And so far from there being any hardship in this, it would seem manifestly just and proper. Their settlement was generally gained by birth or residence in those homes, and it is obviously far more just and equitable that they should follow those homes for their future support, than that they should follow an old town organization, with which they may never have had any other connection than to have been born or to have lived for a longer or shorter period within its territorial limits. Besides, their settlement in the old town grew out of their birth and residence, or the birth and residence of their ancestors, in those very homes. The town to which those homes have been annexed is forever afterwards to enjoy all the profits and advantages of them, and should therefore take all their disadvantages and incumbrances. If this consideration was sufficient to induce the court in *Groton* v. *Shirley* to hold, as they in effect have done, that within the meaning of the second clause of the 7th section of the act of 1828, a new town is created whenever part of one old one is severed therefrom and annexed to another, it ought surely to avail as sufficient reason for giving to the language of the first clause its natural and ordinary signification.

It was conceded in the argument, and is admitted in all the cases in Massachusetts and Maine, that if a new town is made from the severed portion of an old one, the settlement of absent paupers goes with their homes into the new town. It is difficult to perceive why, if a new town is created within the meaning of the second clause of the statute whenever part of one old town is annexed to another, for the purpose of changing the settle-

ment of resident inhabitants, the same reasoning should not construe a new town to be created under like circumstances, for the purpose of changing the settlement of nonresident paupers. But what reason exists for changing the settlement of nonresident paupers, where the severed territory is incorporated into a new town, which does not exist quite as strongly for changing such settlement .where the severed territory is annexed to an old town ? None occurs to us. On the contrary, it would seem far more just and reasonable that the old town, strengthened by an increase of its territory, wealth and population, should support the poor formerly resident upon its new territory, than that those persons who happen at the moment of its incorporation into a new town to be resident upon it, should be subjected to that burthen ; and the town from which the territory is severed is not less truly divided in the one case than in the other.

But the construction of the statute for which the defendants contend, if carried out as it might be in many cases, completely nullifies and destroys the statute. Suppose that one piece after another, year after year, is severed from an old town and annexed to the adjoining towns, until the whole is annexed, what then becomes of the settlement of nonresident paupers ? Or, what is not unfrequently the case, suppose the whole town is divided into four or five tracts, and these are severally annexed to adjoining towns at the same time, where are absent paupers to be supported ? It is evident their settlement must be wholly lost, and the burden of their maintenance thrown entirely upon the counties where they happen to be found. Such a result seems to us clearly to demonstrate the unsoundness of the construction which leads to it. It may be said that the Legislature would provide for such a contingency, but this could hardly be done otherwise than by reënacting and applying to that particular case the precise provisions, as we regard them, of the statute now under consideration.

Such being our views of the design and intention of the Leglature in its enactment, and of the principle intended to be established by the clause of the statute in question, as well as

from the simple and obvious meaning of the language used, we are compelled to the conclusion, that whenever a town is in any way divided, whether the dissevered portion is incorporated into a new town, or joined to an old one, the settlement of all such persons in the old town as are then resident elsewhere, follows the location of their former homes. If those are disannexed, their settlement goes with them, whether into a new town, with a new name, or into a new town, composed of the severed territory and an old town, with the old name. We are, therefore, of opinion that the annexation of that part of the Hayes farm where her father formerly lived, to Barnstead, in 1840, transferred the settlement of Abigail Twombly from Alton to Barnstead, if her settlement was at that time in Alton. We are confirmed in the result at which we have thus arrived by an examination of the provisions of the Revised Statutes on this subject, which do not seem susceptible of any other construction than that which we have given to the act of 1828.

As to the second question raised in this case, it is an established rule that a wife by her marriage acquires the settlement of her husband, if he has any in this State. Revised Statutes, chap. 65, sec. 1; Comp. Stat. 157. And by a settlement acquired in one place, all former settlements are lost. Rev. Stat., chap. 65, sec. 4; Comp. Stat. 158.

From these principles it would follow, that if Lemuel Twombly, jr., had a derivative settlement in Rochester at the time of his marriage, acquired under laws passed before 1796, his wife by her marriage with him before the passage of the act of 1841, (2 Laws 531, chap. 605,) lost her previous settlement and acquired that of her husband, and, under the last mentioned statute, the liability of the town in which her husband's settlement and her own existed, ceased from its passage.

The marriage of the pauper's father is stated to have occurred before 1823, consequently the mother had lost her settlement in Alton, and enjoyed her husband's settlement in Rochester nearly twenty years before the change in the law took place, and could not afterwards have any derivative settlement in Alton, unless

the effect of the law of 1841 was not only to destroy her husband's settlement in Rochester, but to revive and restore to her a settlement which had been lost almost twenty years. That law does not profess to design to accomplish any such result, and to give it such a construction would be clearly wrong.

Upon the remaining point, whether the plaintiffs were bound to prove that Lemuel Twombly gained no settlement in this State between January, 1796, and 1801, we think there can be no doubt. On general principles, the plaintiff affirming the existence or non-existence of facts, or a state of facts essential to his right of recovery, is bound to prove the existence or nonexistence of what he avers, and what is essential to his right of recovery.

Nor does it change the rule that the averment is negative. The proof may be more difficult, but is not the less imperative. Less evidence may be sufficient, but the plaintiff is not the less bound to satisfy the jury that what he alleges is true.

In *Wilmington* v. *Burlington*, 4 Pick. 176, which was a suit for the support of a pauper, on the trial of which a question almost precisely like that now under consideration was raised, the court say : " It was incumbent on the plaintiffs to show, first, that the father of the pauper had not a settlement within the commonwealth ; for though this is a negative in appearance, yet it is proved by showing where he did belong. Otherwise the plaintiffs would always rest their case, upon proving that the mother had a settlement in the defendant town."

When the plaintiffs ground their right of action upon a negative allegation, and when, of course, the establishment of this negative is an essential element in their case, then the proposition affirmed, though negative in its terms, must be proved by the party who states it. 1 Greenleaf's Ev. 93, § 78, and authorities.

The same degree of evidence as in case of an affirmative allegation can hardly be expected, but it must be supported by *prima facie* proof. Perhaps it would be sufficient if such evidence were offered as, in the absence of counter testimony,

would afford ground for presuming the allegation to be true.  1 Greenleaf's Ev. 94, sec. 78, and authorities.

That it was necessary for the plaintiffs to aver and prove the settlement of Abigail Twombly in Alton, and that her husband had gained no settlement elsewhere in this State, is clear from the statute and adjudged cases.  Rev. Stat., chap. 65, sec. 1; *Salem* v. *Andover*, 3 Mass. 436.

The language of the statute is: "A married woman shall have the settlement of her husband, if he has, or shall acquire any in this State, otherwise her settlement at the time of her marriage shall continue."

In this case, if Lemuel Twombly acquired any settlement in this State after January 1, 1796, his son and his son's wife would have it; and before the plaintiff's could claim to rely on the settlement his son's wife had at her marriage, it was incumbent on them to show that her husband's father acquired none in this State, as well from January, 1796, to 1801, as after that time.

Such being our views of the validity of the various objections to the plaintiff's right to recover, there must be

*Judgment for the defendants.*